UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

JACQUELYN  BROWN,                              )
                                               )
                              Plaintiff,        )
                vs.                            )
                                               )        No. 1:14-cv-01797-JMS-MJD
CAROLYN  COLVIN Acting Commissioner            )
of Social Security,                            )
                                               )
                              Defendant.        )

## REPORT AND RECOMMENDATION

Jacquelyn Brown, ("Plaintiff") requests judicial review of the final decision of the

Commissioner of the Social Security Administration ("Commissioner") denying her applications

for Social Security Disability Insurance Benefits ("DIB") under Title II and Supplemental

Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C.

§§ 416(i), 423(d), & 1382c(a)(3). For the reasons set forth below, the Magistrate Judge

recommends that the decision of the Commissioner be **REVERSED** and **REMANDED.**

## Procedural History and Background

Plaintiff filed her applications for DIB and SSI on November 1, 2011, alleging an onset

of disability on July 23, 2011. [R. at 19.] She was 47 years old at the time of the alleged onset,

and she had past work experience as a hand painter and machine operator. [R. at 28.] She alleged

disability due to back problems, shoulder problems, left knee pain, and depression. [R. at 22.][1]

Plaintiff's applications were denied initially on January 30, 2012 and on reconsideration

on June 27, 2012. [R. at 19.] Plaintiff requested a hearing, which occurred via videoconference

---

[1] Plaintiff recited the relevant factual and medical background in more detail in her opening brief. [*See* Dkt. 18.] The
Commissioner, unless otherwise noted herein, does not dispute these facts. [*See* Dkt. 19.] Because these facts
involve Plaintiff's confidential and otherwise sensitive medical information, the Court will incorporate by reference
the factual background in the parties' briefs and will articulate only specific facts as needed herein.

before Administrative Law Judge ("ALJ") Kathleen Thomas on February 25, 2013. [*Id.*] Plaintiff

appeared and testified before the ALJ, as did medical expert Tom Wagner, Ph.D. [*Id.*] Also

present were Plaintiff's attorney, M. Michele Cecil, and a vocational expert, Leslie Lloyd, Rh.D.

[*Id.*] The ALJ determined that Plaintiff had not been under a disability at any time from the

alleged onset date through the date of the ALJ's April 29, 2013 decision. [R. at 29-30.] The

Appeals Council denied Plaintiff's request for review on September 5, 2014, [R. at 1-7],

rendering the ALJ's decision final. Plaintiff filed her complaint in this Court on November 3,

2014. [Dkt. 1.]

## **Applicable Standard**

To be eligible for SSI or DIB, a claimant must have a disability under 42 U.S.C. §

423.[2] Disability is defined as "the inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months." 42 U.S.C. § 423(d)(1)(A). In order to be found disabled, a claimant must demonstrate

that his physical or mental limitations prevent him from doing not only his previous work, but

any other kind of gainful employment which exists in the national economy, considering his age,

education, and work experience. 42 U.S.C. § 423(d)(2)(A).

In determining whether a claimant is disabled, the Commissioner employs a five-step

sequential analysis. At step one, if the claimant is engaged in substantial gainful activity, he is

not disabled despite his medical condition and other factors. 20 C.F.R. § 404.1520(b). At step

two, if the claimant does not have a "severe" impairment (i.e., one that significantly limits his

---

[2] In general, the legal standards applied in the determination of disability are the same regardless of whether a claimant seeks DIB or SSI. However, separate, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates. The same applies to citations of statutes or regulations found in quoted court decisions.

ability to perform basic work activities), he is not disabled. 20 C.F.R. § 404.1520(c). At step

three, the Commissioner determines whether the claimant's impairment or combination of

impairments meets or medically equals any impairment that appears in the Listing of

Impairments, 20 C.F.R. pt. 404, subpt. P, App. 1, and whether the impairment meets the twelve-

month duration requirement; if so, the claimant is disabled. 20 C.F.R. § 404.1520(d). At step

four, if the claimant is able to perform his past relevant work, he is not disabled. 20 C.F.R. §

404.1520(f). At step five, if the claimant can perform any other work in the national economy, he

is not disabled. 20 C.F.R. § 404.1520(g).

Upon judicial review, the ALJ's findings of fact are conclusive and must be upheld by

this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v.*

*Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* This court

may not reweigh the evidence or substitute its judgment for that of the ALJ. *Overman v. Astrue*,

546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of

testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993).

However, the "ALJ's decision must be based upon consideration of all the relevant evidence."

*Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). To be affirmed, the ALJ must articulate her

analysis of the evidence in her decision; while she "is not required to address every piece of

evidence or testimony," she must "provide some glimpse into her reasoning . . . [and] build an

accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

## The ALJ's Decision

The ALJ first determined that Plaintiff met the insured status requirements of the Act

through December 31, 2015. [R. at 21.] She then proceeded through the five-step sequential

3

evaluation. At step one, she found that Plaintiff had not engaged in substantial gainful activity

("SGA") since July 23, 2011, the alleged onset date. [*Id.*] At step two, she found that Plaintiff

suffered from the following severe impairments: "history of lumbar surgery, with residual pain

and limitation, obesity and depression." [R. at 22.]

At step three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that met or medically equaled a listed impairment. [*Id.*] The ALJ did not

specifically consider any listings at this stage of her analysis, but Plaintiff does not challenge this

aspect of the ALJ's decision, [*see* Dkt. 18], and any argument on this point is accordingly

waived. *See, e.g.*, *Ripberger v. Corizon, Inc.*, 773 F.3d 871, 879 (7th Cir. 2014) (undeveloped

arguments are waived).

The ALJ next analyzed Plaintiff's residual functional capacity ("RFC"). She concluded

that Plaintiff could:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [s]he
> can no more than frequently climb ladders, ropes or scaffolds and frequently
> stoop and crawl. Because of her mental impairment, she is limited to repetitive,
> one-to-three step jobs for two-hour intervals. Changes in the workplace must be
> introduced gradually.

[R. at 22.] At step four, the ALJ concluded that this RFC did not allow Plaintiff to

perform her past relevant work. [R. at 28.] The ALJ thus proceeded to step five and

received testimony from the vocational expert indicating that someone of Plaintiff's age,

education, work experience, and RFC would be able to perform jobs such as

doorkeeper/greeter, sedentary assembler, and surveillance system monitor. [R. at 29.]

Because these jobs existed in significant numbers in the national economy, the ALJ

concluded that Plaintiff was not disabled. [R. at 29-30.]

4

## Discussion

Plaintiff asks the Court to reverse and remand the ALJ's decision for three reasons. Plaintiff first contends that the ALJ's physical RFC assessment was not supported by the medical evidence. [Dkt. 18 at 14.] Plaintiff then contends that the ALJ erred by improperly discounting Plaintiff's complaints about severe pain in her back and extremities. [*Id.* at 21.] Plaintiff finally argues that remand is warranted for the consideration of new material evidence. [*Id.* at 23.]

### A.   Physical RFC Assessment

Plaintiff contends that the ALJ's physical RFC assessment was erroneous because the ALJ 1) improperly discounted the opinion of treating physician Dr. Ira Means [Dkt. 18 at 14]; 2) improperly relied on the opinion of consultative examiner Dr. Olaguoke Akinwande [*id.* at 18]; and 3) improperly evaluated Plaintiff's manipulative limitations. [*Id.* at 20.]

### 1.   Treating Source Dr. Ira Means

An ALJ must giving a treating physician's opinion controlling weight if it is both "(1) supported by medical findings; and (2) consistent with substantial evidence in the record." *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (citing 20 C.F.R. § 404.1527(c)(2)). If the ALJ finds that the opinion is not entitled to controlling weight, the ALJ must still assess the proper weight to give to the opinion. *See id.* This involves consideration of several factors, including the "length, nature, and extent of the physician and claimant's treatment relationship, whether the physician supported his or her opinions with sufficient explanations, and whether the physician specializes in the medical conditions at issue." *Id.* (citations omitted). If the ALJ "discounts the physician's opinion after considering these factors," a reviewing court "must allow that decision to stand so long as the ALJ minimally articulated his reasons" for doing so. *Id.* (internal quotations marks and alteration omitted). This is a "very deferential standard," *id.*, but even so, a

court must assure itself that the ALJ "offer[ed] 'good reasons' for discounting [the] treating physician's opinion." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citation omitted).

In this case, Plaintiff received care from Dr. Ira Means at several appointments in 2012. [*See* R. at 433-465.] That doctor opined that Plaintiff could "stand/walk a combined total of less than two hours per day; sit about 4 hours per day; and occasionally lift up to 10 pounds." [R. at 25; R. at 474-75.] Dr. Means also wrote that Plaintiff would have to change positions every 10 to 30 minutes; would often have to lie down during the day; and would frequently miss days of work. [R. at 25; R. at 474-76.] The ALJ acknowledged that Dr. Means was a "treating" source, [R. at 23], but rather than giving these opinions controlling weight, the ALJ stated that the opinions were "not afforded any weight whatsoever." [R. at 26.] She said the opinions were "unsupported by substantial evidence, including [Dr. Means'] own office and treatment notes," and she asserted that the "claimant made good recovery [from] lumbar surgery;" was seen by Dr. Means only on a "routine basis for medication refills;" and had not pointed to any "evidence or notation of residuals which equate to the limitations assessed." [R. at 26.] As explained further below, this explanation was correct in some respects, but this explanation ultimately does not constitute a "good reason" for discounting the opinion of Dr. Means.

The ALJ first considered Plaintiff's left knee impairment. [R. at 25.] She noted that "[t]here is no objective medical evidence of a condition affecting her left knee," and that "[i]f she has mentioned any knee-related problems to Dr. Means, no particular treatment is prescribed and she has not been referred for a knee x-ray." [*Id.*] The effects of Plaintiff's knee impairment were thus not "supported by medical findings," *Elder* v, 529 F.3d at 415, such that the ALJ was justified in concluding that—to the extent Dr. Means' opinion relied on this alleged impairment—Dr. Means' opinion was not entitled to controlling weight.

6

Next, the ALJ discussed Plaintiff's left shoulder impairment. She noted that Plaintiff presented to Dr. Means in September 2012 with complaints of left shoulder pain and difficulty gripping objects. [R. at 23.] A subsequent MRI revealed a left rotator cuff tear. [*Id.*] Further, Plaintiff in March 2013 was referred for EMG studies of both upper extremities, which studies "revealed evidence of bilateral median neuropathy, worse on the left than right." [*Id.* (citation omitted).] Based on these studies, Plaintiff's complaints about her left arm were "supported by medical findings," *Elder*, 529 F.3d at 415, but the ALJ nonetheless discounted them. She noted that at a consultative examination with Dr. Olaguoke Akinwande, Plaintiff had normal strength and a normal grip in both upper extremities, and that Plaintiff voiced no complaints about a left shoulder impairment. [R. at 23 (citing R. at 414).] These findings could indicate that Dr. Means' opinion about Plaintiff's shoulder was not "consistent with substantial evidence in the record," *Elder*, 529 F.3d at 415, such that Dr. Means' opinion about this impairment would not be entitled to controlling weight. *See id.*

The ALJ, however, should not have relied on Dr. Akinwande's examination. That doctor examined Plaintiff in January 2012, [R. at 413], several months before Plaintiff presented to Dr. Means with complaints about her left shoulder. Thus, even if Plaintiff had normal functioning in her extremities at the time of Dr. Akinwande's examination, Plaintiff's condition easily could have worsened in the time before she complained about her left arm to Dr. Means. Indeed, the ALJ herself acknowledged that Plaintiff's left shoulder and wrist impairments were "of recent onset," [R. at 23], and it thus made little sense for the ALJ to discount these impairments on the basis of on an examination that took place one year and four months before the ALJ's decision.

This, in turn, raises a durational issue: Plaintiff presented to Dr. Means with complaints about her left shoulder in September 2012, [R. at 23], and the ALJ issued her opinion on April

7

29, 2013, [R. at 30.] At the time of the opinion, then, Plaintiff's left shoulder impairment had not lasted for at least twelve months, such that the ALJ may have been justified in determining that the condition was not disabling. *See* 42 U.S.C. § 423(d)(1)(A) (impairment must last twelve months for finding of disability).

The ALJ, however, provided an inadequate explanation of this issue. First, the 12-month durational requirement allows for a finding of disability when an impairment "has lasted **or can be expected to last** for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (emphasis added). Thus, even if Plaintiff's left arm impairment had not **already** lasted for twelve months at the time of the ALJ's decision, the impairment still could have been the basis for a finding of disability. The ALJ tried to address this point when she wrote that Plaintiff's left arm "conditions are expected to resolve with appropriate treatment," [R. at 23], but the ALJ also noted that Plaintiff had been "referred to a surgeon for an evaluation of her shoulder condition[.]" [*Id.*] That evaluation had not been completed at the time of Plaintiff's hearing, [*see id.*], and so the ALJ's conclusion that Plaintiff's shoulder condition would "resolve" appears to be based not on any evidence in the record, but on speculation about what Plaintiff's examining surgeon might find. This sort of speculation undermines any conclusion that the ALJ based her opinion on substantial evidence. *See, e.g.*, *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence.").

Second, the SSA provides that in "[a]ll cases denied on the basis of insufficient duration," the ALJ "must state clearly in the denial rationale" that:

> Within 12 months of onset, there was or is expected to be sufficient restoration of function so that there is or will be no significant limitation of the ability to perform basic work-related functions; or

> Within 12 months of onset, there was or is expected to be sufficient restoration of function so that in spite of significant remaining limitations the individual should be able to do past relevant work or otherwise engage in SGA, considering pertinent vocational factors.

SSR 82-52 (citations omitted). The ALJ's opinion in this case contained no such language. [R. at 23.] Thus, even if the ALJ in this case alluded to a durational basis for denying Plaintiff's claim, the ALJ should have been more explicit in her analysis of this issue, and her opinion is accordingly deficient for this reason as well. *See* SSR 82-52; *accord, e.g.*, *McKinley v. Colvin*, No. 2:13-CV-485-PRC, 2015 WL 404565, at *7 (N.D. Ind. Jan. 28, 2015) (remand necessary because "the ALJ did not make a finding as to the duration of the [new impairment]").[3]

The ALJ finally discussed Plaintiff's herniated disc and back pain. [R. at 23.] Plaintiff underwent surgery for this condition in September 2011, and the procedure resolved the "sharp, shooting pain" that Plaintiff had experienced before the surgery. [R. at 23-24.] Even after the procedure, however, Plaintiff continued to complain about her "back aching" and a "burning sensation" in her lower extremities. [R. at 24.] Her surgeon then recommended that she remain off work until she could be seen for a follow-up appointment in January or February of 2012, but, as the ALJ noted, Plaintiff never returned to the surgeon for such an appointment. [*Id.*]

This failure to seek follow-up treatment could be a sign that Plaintiff's back condition was not as severe as indicated in Dr. Means' report or in Plaintiff's own statements. *See* SSR 96-7p (noting that statements are less credible if "the level or frequency of treatment is inconsistent with the level of complaints"). Before drawing such a conclusion, however, an ALJ must

---

[3] It is of course Plaintiff's burden to show that the allegedly disabling condition could be expected to last for at least 12 months. *See, e.g.*, *Plump v. Colvin*, No. 1:13-CV-1446-DKL-SEB, 2015 WL 1143111, at *4 (S.D. Ind. Mar. 12, 2015) (citing *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir.2011)). Here, however, Plaintiff put forth evidence indicating that she was continuing to experience difficulties in her upper extremities, and that she was seeking more extensive treatment for these difficulties. [*See, e.g.*, R. at 23 (ALJ's acknowledgement of impending surgical consult); R. at 444 (Dr. Means' recommendation of new consultation for treatment of left shoulder).] In light of this evidence, the ALJ should have done more than simply speculate that Plaintiff's impairments would "resolve."

consider any explanation for a failure to seek treatment, including, *inter alia*, inability to pay. *See id.* ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide[.]"). Here, Plaintiff testified that her insurance lapsed in January 2012—the same time that she was to have returned to the surgeon for the follow-up. [R. at 44.] The ALJ did not mention this lapse, [*see* R. at 24], and to the extent that the ALJ relied on lack of treatment to discount Plaintiff's back impairment, the ALJ erred.

Further, Plaintiff **did** continue to seek treatment even **despite** the lapse in insurance. In particular, Plaintiff presented to a free clinic in January 2012. [R. at 406-07.] She complained of tingling and numbness in her leg, and she asserted that the medications that her surgeon had prescribed were not helping. [*Id.*] The ALJ acknowledged these complaints, [*see* R. at 24], but she did not acknowledge that Plaintiff also complained of severe back pain. [R. at 406 ("Musculoskeletal: Positive for back pain (lower back down the R leg)"); R. at 407 ("The back still hurts a lot. . . . She tried to go back to work and she was not able to do the work because of the pain.").] Such evidence belies the ALJ's statement that Plaintiff experienced a "good recovery" from her back surgery, and the notation that Plaintiff was unable to work suggests that Dr. Means' statements about Plaintiff's restrictions may have been consistent with other evidence in the record.

The ALJ then turned to Plaintiff's interactions with Dr. Means herself. She noted that Plaintiff "established a relationship with I. Means . . . with complaints of low-back pain, but mainly for complaints of shoulder pain[.]" [R. at 24.] This mischaracterizes Plaintiff's treatment. Although Dr. Means did attempt to treat Plaintiff's shoulder pain, [*see, e.g.*, R. at 444], Dr.

10

Means was also extensively involved in attempting to treat Plaintiff's back pain. First, Plaintiff presented in April 2012 with active back pain, and Plaintiff was referred for a "physical therapy consult [to] evaluate and treat for lower back pain." [R. at 441.] Then, in June 2012, Plaintiff again presented with active back pain and was referred for an MRI of her lumbar spine. [R. at 442.] The MRI revealed a "left paracentral L5-S1 disc bulge" and post-operative scar tissue, [R. at 461], and Plaintiff's doctors recommended physical therapy in lieu of additional surgery. [*Id.*] Plaintiff's pain, however, persisted. [*See, e.g.*, R. at 460 (complaints of back and shoulder pain); R. at 460-61 ("[L]ow back pain [was] about the same, maybe a little worse, and she continue[d] to have some numbness in her hips and thighs[.]"); R. at 462 ("[Complained of] back, [right] leg pain."). Finally, in November 2012, Dr. Means wrote that Plaintiff "has had pain since she had back surgery" and that Plaintiff's pain was "constant in back and down [right] leg to heel." [R. at 465.]

The above observations are inconsistent with the ALJ's assertion that Plaintiff mainly sought treatment for her shoulder. In addition, these observations cannot easily be squared with the ALJ's contention that Plaintiff had a "good recovery" from her surgery and was seen solely on a "routine basis for medication[.]" [R. at 26.] To the contrary, Plaintiff's back pain persisted long after her surgery, and Plaintiff's doctors recommended both diagnostic tests and physical therapy to try to resolve Plaintiff's pain. In addition, other evidence corroborates Dr. Means' findings: The ALJ's RFC analysis relied extensively on Dr. Akinwande's consultative examination, [*see* R. at 26], but at that appointment, Plaintiff complained about her back pain and Dr. Akinwande himself found that Plaintiff had decreased lumbar range of motion. [R. at 413-14.] Together, then, the above-described findings indicate that Dr. Means' opinion was not necessarily "[un]supported by medical findings" or "[in]consistent with substantial evidence in

the record," *Elder*, 529 F.3d at 415, and the ALJ was therefore not necessarily justified in discounting Dr. Means' opinion.

Admittedly, certain portions of the above-cited records appear to support the ALJ's conclusions. The 2012 MRI of Plaintiff's back, for instance, did show a bulging disc on Plaintiff's left side, but Plaintiff's doctor noted that "the left-side disc bulge . . . does not seem to correlate with [Plaintiff's] entirely right-side symptoms." [R. at 461.] This, in turn, could imply that, to the extent Dr. Means' opinions were based on Plaintiff's "right-side symptoms," the opinions were unsupported by objective medical evidence and were thus entitled to less weight. *See Elder*, 529 F.3d at 415. In addition, the form on which Dr. Means provided her opinions was clearly provided by Plaintiff's attorney in preparation for Plaintiff's hearing before the ALJ. [*See* R. at 476 (form completed seven days before hearing).] This could indicate that Dr. Means was exaggerating the effect of Plaintiff's impairments in order to assist Plaintiff's disability claim. *See, e.g.*, *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (internal quotation marks and citation omitted) ("As we previously have noted, [t]he patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."). The ALJ's opinion, however, did not elaborate on these issues, [*see* R. at 24], and so the Court cannot sustain the ALJ's conclusion on the basis of these explanations. *See, e.g.*, *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943)) ("We confine our review to the rationale offered by the ALJ.")

In the end, then, the Court finds that the ALJ did not properly evaluate Dr. Means' opinion. Although the ALJ's assessment of Plaintiff's knee impairment was appropriate, the ALJ's assessment of Plaintiff's shoulder impairment was lacking. In addition, the ALJ herself acknowledged that Plaintiff's most serious impairment was her back condition, [R. at 23], and

yet her evaluation of Dr. Means' opinion with respect to this condition ignored numerous complaints and medical findings. The Court thus cannot say that the ALJ gave "good reasons" for discounting Dr. Means' impairment. In addition, this error was not harmless: the vocational expert testified at the hearing that imposing functional restrictions based on Dr. Means' opinion would preclude Plaintiff from performing substantial gainful activity, [R. at 63], and attaching more weight to Dr. Means' opinion thus easily could have changed the outcome of Plaintiff's claim. As such, further review of Plaintiff's claim is necessary. On remand, the ALJ should reevaluate Dr. Means' opinion in light of the above analysis. This order should not be construed as a directive that the ALJ **must** give Dr. Means' opinion controlling weight, but the ALJ should at least reconsider the opinion, and the ALJ should likely give the opinion more than "[no] weight whatsoever." [R. at 26.]

### 2. Dr. Akinwande

Plaintiff argues that the ALJ gave too much weight to the opinion of consultative examiner Dr. Akinwande. [Dkt. 18 at 19.] That examiner opined that Plaintiff's ability to sit or stand "for longer than 50 minutes or any given time is restricted," [R. at 414], and the ALJ then indicated in her hypothetical questions to the vocational expert that Plaintiff would need to change positions every 50 minutes. [R. at 64.] Plaintiff contends the ALJ's hypothetical was erroneous because the phrase "or any given time" could indicate that Dr. Akinwande meant to impose additional limits on Plaintiff's ability to sit or stand. [Dkt. 18 at 19.]

The Court does not agree. It seems clear that Dr. Akinwande meant to write that Plaintiff's ability to sit or stand was restricted "for longer than 50 minutes **at** any given time" or "**for** any given time." If Dr. Akinwande meant to impose an additional limit other than 50 minutes, he likely would have included such a limitation in his opinion. That he did not include

any such limitation suggests that he did not intend to do so, and the Court thus concludes that the ALJ was justified in interpreting Dr. Akinwande's examination as imposing as a 50-minute sitting/standing restriction.

Dr. Akinwande also opined that Plaintiff's "[l]ifting, carrying and handling [of] objects would be limited to 15 pounds at this time." [R. at 414.] Plaintiff faults this opinion for not specifying how frequently Plaintiff could lift or carry such objects, [Dkt. 18 at 19], but again, the Court does not find such an omission to be meaningful. As the Commissioner notes, [Dkt. 19 at 16], the lack of any limitation on the frequency of lifting or carrying likely means that Dr. Akinwande simply meant to impose no additional restrictions on Plaintiff's lifting or carrying.

Plaintiff nonetheless argues that it is unclear just how often the ALJ expected Plaintiff to lift or carry objects, and that this lack of clarity precludes meaningful judicial review. [*See* Dkt. 18 at 19.] The ALJ, however, restricted Plaintiff to "light work as defined in 20 CFR 404.1567(b) and 416.967[.]" [R. at 22.] These regulations define such work to include "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). The SSA then defines "frequent" to mean "occurring from one-third to two-thirds of the time." SSR 83-10. The SSA's rules and regulations thus resolve any alleged ambiguity in the ALJ's opinion, and Plaintiff's argument on this point lacks merit.

On remand, then, the ALJ may continue to consider Dr. Akinwande's opinion in much the same way that she did when originally reviewing Plaintiff's case. Naturally, the ALJ may conclude Dr. Akinwande's opinion is entitled to less weight vis-à-vis Dr. Means' opinion, but the ALJ may still treat Dr. Akinwande's statements as indicating that—at least in Dr. Akinwande's opinion—Plaintiff could sit or stand for up to 50 minutes at a time and could frequently lift or carry objects up to 15 pounds.

14

### 3.   Manipulative Limitations

Plaintiff finally faults the ALJ for discounting Plaintiff's alleged manipulative difficulties. [Dkt. 19 at 20.] As noted above, Plaintiff complained of shoulder pain and difficulty gripping objects when she presented to Dr. Means in September 2012, and subsequent diagnostic imaging provided objective evidence to support such complaints. [R. at 23.] The ALJ discounted these complaints largely on the basis of the consultative examination that Dr. Akinwande performed seven months earlier, [*see id.*], and, as described earlier, the decision to do so was erroneous. On remand, then, the ALJ should more fully consider the extent of Plaintiff's alleged manipulative difficulties.

The Commissioner resists this conclusion on the grounds that even if the ALJ should not have relied on Dr. Akinwande's examination, the ALJ still imposed a 15-pound lifting and/or carrying restriction that accounted for Plaintiff's alleged manipulative difficulties. [Dkt. 19 at 17.] As explained above, however, the ALJ in this case must reevaluate the weight given to Dr. Means' opinion. That doctor opined that Plaintiff was subject to more severe lifting and carrying restrictions than did Dr. Akinwande, [*see* R. at 475], and so the 15-pound restriction may no longer adequately account for Plaintiff's functioning.

In addition, the SSA differentiates between exertional and non-exertional activities: lifting and carrying, for example, are exertional activities, whereas handling and manipulating objects are non-exertional activities. *See, e.g.*, *Neave v. Astrue*, 507 F. Supp. 2d 948, 959 (E.D. Wis. 2007) ("Exertional capacity refers to the claimant's abilities to perform seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. Non-exertional capacity includes all work-related functions that do not depend on the individual's physical strength: postural (e.g., stooping, climbing), manipulative (e.g., reaching, handling), visual

(seeing), communicative (hearing, speaking), and mental (e.g., understanding and remembering instructions and responding appropriately to supervision) activities."). Given this distinction, it is unclear that limiting the weight that Plaintiff could carry would necessarily account for Plaintiff's alleged inability to grip or manipulate objects, such that the ALJ's 15-pound restriction did not adequately address the full extent of the impairments in Plaintiff's upper extremities. Again, then, the ALJ did not properly account for Plaintiff's manipulative limitations, and so on remand, the ALJ must reevaluate whether Plaintiff's alleged difficulties in this area may affect her RFC.

### B.  Evaluation of Plaintiff's Complaints

Plaintiff testified at the hearing that she suffers from pain in her right leg, left knee, left shoulder, and back. [R. at 46-47.] She added that she would not be able to stand, sit, or walk for more than thirty minutes, and that she needed a cane to "get around," [R. at 48-49, 50.] She also stated that she would not be able to lift more than five pounds with either hand. [R. at 49.] The ALJ found that these statements were "not entirely credible," [R. at 25], and Plaintiff now contends that the ALJ erred in doing so. [Dkt. 18 at 19.]

This Court will not disturb an ALJ's credibility determination unless it is "patently wrong." *Cannon v. Apfel*, 213 F.3d 970, 977 (7th Cir. 2000) (quoting *Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995)). An ALJ, however, must still "justify the credibility finding with specific reasons supported by the record." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). In addition, an ALJ should consider factors such as the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; precipitating and aggravating factors; the effects of medication; the effects of other treatment; and the presence or lack of objective medical evidence. 20 C.F.R. § 404.1529(c); *see also* SSR 96-7p.

16

The ALJ in this case considered most of these factors. She noted, for example, that there was no medical evidence indicating that Plaintiff suffered from an impairment that would cause left knee pain or that would require a cane to ambulate. [R. at 25.] She also noted that Plaintiff did not complain of any severe side effects from the medication that she used to treat her back pain. [*Id.*] These were appropriate considerations, *see* SSR 96-7p, and they accordingly help support the ALJ's determination that Plaintiff was not entirely credible.

The ALJ, however, also asserted that Plaintiff received predominantly "conservative and routine treatment" for her impairments. [*Id.*] This conclusion was based largely on a comparison of Plaintiff's treatment before and after her back surgery. The ALJ observed that, before her surgery, Plaintiff on several occasions presented to the emergency room for treatment of her back pain. [R. at 23; *see also* R. at 355, 359.] The ALJ then observed that, after her surgery, "there is no evidence [Plaintiff] has sought/required emergency room treatment." [R. at 24.] She also noted that Plaintiff did not return to her surgeon for a suggested follow-up in January of 2012, [*id.*], with the apparent implication that Plaintiff's condition must have improved to such a degree that she no longer required ER treatment or follow-up care.

The ALJ's opinion overstates the significance of her observations. First, Plaintiff's failure to follow up with her surgeon was—as discussed above—likely a result of the lapse in her insurance. Further, even if Plaintiff could not see her surgeon in January 2012, Plaintiff still sought treatment from a free clinic, at which time she continued to complain about severe back pain. [R. at 406-07.] It was thus erroneous for the ALJ to infer that Plaintiff's lack of treatment was due to a lack of persistent symptoms.

Second, Plaintiff testified that sometime after her insurance lapsed, she enrolled in a Wishard Advantage health plan. [R. at 46-47.] She then received treatment from and participated

in physical therapy through Wishard Health Services. [R. at 456-65, 477-82.] Hence, if Plaintiff did not return to the emergency room for treatment of her back condition, it was likely because she was already receiving treatment from Wishard. Again, then, the ALJ should not have concluded that the absence of emergency room visits were indicative of a lack of symptoms.

The ALJ also improperly minimized other aspects of Plaintiff's treatment. The ALJ attached much weight to the fact that Plaintiff was "treated with medication" on a "conservative" basis, [R. at 25], but this statement ignores Dr. Means' decision to refer Plaintiff for both physical therapy and a neurosurgery consultation to address Plaintiff's persistent back problems. [*See, e.g.*, R. at 444 ("Neurosurgery Consult/Appt: Nurse/staff to schedule an appointment to see anyone next available for diagnosis of right S1 radicular pain/scar tissue."); *see also id.* ("Consultation Note: (NEW) Anesthesia Pain Clinic . . . Please see patient routinely for pain[.]"). Plaintiff also specifically testified that she had "an appointment [with] a back pain specialist" scheduled to occur within a month of the hearing before the ALJ. [R. at 46.] Thus, even if Plaintiff did receive only medication and conservative treatment in the initial period after her back surgery, that treatment evidently did not control her condition, and Plaintiff and her physician accordingly sought other ways to alleviate Plaintiff's symptoms. Such efforts tend to support a claimant's complaints about his or her impairments, *see* SSR 96-7p ("[R]eferrals to specialists, or changing treatment sources may be a strong indication that the symptoms are a source of distress to the individual and generally lend support to an individual's allegations of intense and persistent symptoms."), and the ALJ in this case erred by failing to account for Plaintiff's treatment efforts.

Next, Plaintiff's 2012 MRI indicated that more aggressive treatment options—such as surgical intervention—were not feasible. [R. at 461 ("Postsurgical scar granulation tissue appears

to be present at the prior surgical site. This is not something that we can go in and remove surgically, as it tends to just recur."). Moreover, even if surgery had been possible, the ALJ should have tried to determine whether Plaintiff nonetheless had valid reasons to try to avoid surgery. *See* SSR 96-7p. Nothing in the ALJ's opinion suggests that she tried to do so, [R. at 23-25], and the ALJ therefore erred by concluding that Plaintiff's "conservative" treatment undermined Plaintiff's credibility. *See id.*; *accord, e.g.*, *Beardsley v. Colvin*, 758 F.3d 834, 840 (7th Cir. 2014) ("The ALJ here made no evident attempt to determine why Ms. Beardsley elected not to have expensive and invasive surgery on her knee[.] . . . The failure to explore this evidence was a legal error."); *Cage v. Apfel*, No. NA99-0135-C-H/S, 2000 WL 1206710, at *6 (S.D. Ind. July 24, 2000) ("Given the advice Mr. Cage received from his physicians and the fact that similar procedures proved ineffective in the past, the ALJ could not reasonably fault Mr. Cage for choosing to undergo injections and physical therapy as alternatives to additional surgery.").

Overall, then, the ALJ's credibility assessment was flawed. Although the ALJ discussed many of the correct factors, and although some of these factors did support a finding that Plaintiff's complaints were not entirely credible, the ALJ's credibility determination largely relied on an erroneous assessment of Plaintiff's treatment history. The ALJ must therefore reevaluate Plaintiff's credibility based on the analysis above.

Notably, the ALJ should not construe this conclusion as an order that Plaintiff's complaints **must** be deemed credible. Indeed, Plaintiff's own complaints were more restrictive than the limitations imposed by her treating physician. [*Compare, e.g.*, R. at 46, 50 (Plaintiff's testimony) (describing five-pound lifting restriction and stating that cane is needed "to get around")*, with* R. at 475 (Dr. Means' evaluation) (describing 10 to 20-pound lifting restriction and stating that cane is not necessary for "even occasional standing/walking").] In light of such

19

inconsistencies, the ALJ may yet conclude that Plaintiff's complaints are in fact "not entirely credible." [R. at 25.] As it is, however, remand is already necessary for the ALJ to reassess Dr. Means' opinion, and so the ALJ should take the opportunity to also reassess whether Plaintiff's complaints were more credible than the ALJ originally concluded.

### C.  Consideration of New Evidence

Plaintiff finally attacks the decision of the SSA's Appeals Council. [Dkt. 18 at 23.] At this stage in the review process, Plaintiff submitted additional evidence of her alleged disability, which evidence the Appeals Council designated as Exhibit 18F. [R. at 5-6 (Appeals Council decision); *see also* R. at 483-510 (Exhibit 18F).] Plaintiff now contends that this Court must remand the ALJ's decision for proper consideration of the additional evidence. [Dkt. 18 at 13-14, 23-28.] She argues that remand is appropriate under either sentence four or sentence six of 42 U.S.C. § 405. [*Id.* at 23-28.]

### 1.  Sentence Four

Sentence Four gives a district court the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C.§ 405(g). Here, Plaintiff argues that remand is appropriate because the Commissioner "improperly concluded evidence submitted to the Appeals Council was not new and material to Appellant's claim for disability benefits." [Dkt. 18 at 24.] Evaluating this argument requires an overview of the Appeals Council's procedures.

The SSA's regulations allow a claimant seeking review of an ALJ's decision to submit additional evidence to the Appeals Council. 20 C.F.R. § 404.970(b). This review occurs in three steps. First, the Appeals Council "consider[s] the additional evidence" only if the evidence is 1)

20

"new," 2) "material," and 3) "relate[d] to the period on or before the date of the administrative

law judge hearing decision." [*Id.*] Evidence that meets this three part test is deemed "qualifying"

evidence. *See Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir. 2012). Thus, step one of the Appeals

Council review requires the Council to determine whether any additional evidence is

"qualifying" evidence.

      If the Council determines that the additional evidence is in fact qualifying, then the

Council proceeds to step two of the evaluation. Here, the Council "evaluate[s] the entire record

including the new and material evidence submitted," and asks whether the ALJ's decision is

"contrary to the weight of the evidence currently of record"—that is, the record that was before

the ALJ in addition to the qualifying evidence. 20 C.F.R. § 404.970(b). If the ALJ's decision is

**not** contrary to the weight of the evidence currently of record, then the Appeals Council prepares

a denial notice and the review ceases at step two. *Id.*; *see also Perkins v. Chater*, 107 F.3d 1290,

1294 (7th Cir. 1997). If, on the other hand, the ALJ's decision **is** contrary to the weight of the

evidence currently of record, then the Appeals Council proceeds to step three of its review: there,

the Council undertakes a complete review of the claimant's entire case. *See Perkins*, 107 F.3d at

1294 ("If [the Council] concludes as a result of that evaluation that the administrative law

judge's action appears to be contrary to the weight of the evidence 'currently' of record—that is,

the old evidence plus the new submissions—only then does it proceed to a full review of the

case.").

      During this process, the Appeals Council follows the SSA's Hearings, Appeals and

Litigation Law manual (HALLEX). If the Appeals Council determines at step one that the

additional evidence fails any part of the three-part test outlined above, then the Council "will

prepare a denial notice" and "[n]ot exhibit the evidence." HALLEX I-3-5-20(A), 1993 WL

643143, at *1. If, for instance, the Council determines that a piece of additional evidence is not "new," then the Council would conclude that the additional evidence was not qualifying; the Council would prepare a denial notice; and the Council would **not** designate the additional evidence as an exhibit. *See id.*

If, in contrast, the Council **does** determine that the additional is qualifying—i.e., the evidence **is** "new," "material," and "relate[d] to the period on or before the date of the [ALJ] hearing decision"—then the Council proceeds to step two of its review and determines whether the ALJ's decision is contrary to the weight of evidence in the record, including the qualifying evidence. *See* HALLEX I-3-5-20(B), 1993 WL 643143, at *1. If the ALJ's decision is **not** contrary to the weight of evidence in the record—including the qualifying evidence—then the Appeals Council will again "[p]repare a denial notice." *Id.* In this instance, however, the Appeals Council will **also** "[e]xhibit the evidence and prepare an exhibit list with the accompanying order." *Id.* As an example, then, a claimant might submit evidence that is in fact qualifying evidence, but the Appeals Council might nonetheless determine that the ALJ's decision was not contrary to the weight of evidence in the record, including the qualifying evidence. The Appeals Council would then deny the request for review, but would designate the additional evidence as an exhibit and include a listing of that exhibit with the denial notice. *See id.*

The distinction between the steps of the Appeals Council's review has significant ramifications for judicial review. At step one of the process, the Appeals Council applies 20 C.F.R. § 404.970(b) to determine if evidence is "new," "material," and "relate[d] to the period on or before the date of the [ALJ] hearing decision." This determination is not in and of itself a final appealable order. *Eads v. Sec'y of Dep't of Health & Human Servs.*, 983 F.2d 815, 817 (7th Cir. 1993). If, however, the Appeals Council makes a mistake of law in applying the regulation, a

district court **can** review this mistake, and any review is *de novo*. *See Perkins*, 107 F.3d at 1294 ("Our review of the question whether the Council made an error of law in applying [20 C.F.R. § 404.970(b)] is *de novo*."); *see also Eads*, 983 F.2d at 817 ("[I]f the [Appeals Council's] refusal rests on a mistake of law, such as the determination . . . that the evidence newly submitted to the Appeals Council was not material to the disability determination, the court can reverse[.]"). Hence, a district court **can** review the Appeals Council's step one assessment of whether additional evidence is "new," "material," or "relate[d] to the period on or before the date of the [ALJ] hearing decision."

In contrast, a district court **cannot** review the Appeals' Council's decision at step two. *See Perkins*, 107 F.3d at 1294 (emphasis added) (citation omitted) ("Our review of the question whether the Council made an error of law in applying [20 C.F.R. § 404.970(b)] is *de novo*. **In the absence of any such error, however, the Council's decision whether to review is discretionary and unreviewable**."). Thus, as long as the Appeals Council followed the proper procedures, its conclusion about whether to deny a request for review at step two cannot be reviewed. *See id.* ("[U]pon its consideration of the entire record, the Council concluded that there was nothing before it that undermined the ALJ's earlier decision. It accordingly denied review. We see no error as a matter of law in this method of proceeding, and thus . . . we will not review the Council's discretionary decision."); *see also Eads*, 983 F.2d at 817-18 ("[Plaintiff asks] us to reverse the denial of disability benefits on the ground that the administrative law judge's decision is erroneous when evaluated in light of all the evidence in the case, including evidence that the administrative law judge could not have considered because it was never submitted to him. This we cannot properly do. It would change our role from that of a reviewing court to that of an

administrative law judge, required to sift and weigh evidence in the first instance, rather than limited as we are to reviewing evidentiary determinations made by the front-line factfinder.").

This difference in the availability of judicial review disposes of Plaintiff's sentence four argument. As noted above, Plaintiff submitted additional evidence to the Appeals Council, which the Council then designated as Exhibit 18F. [R. at 6.] The fact that the Council added the evidence to the record as an exhibit indicates that the Council **did** conclude that the evidence was "qualifying" evidence—i.e., that it was new, material, and related to the time period of the ALJ's decision. *See* HALLEX I-3-5-20(B), 1993 WL 643143, at *1; *see also Pottorff v. Colvin*, No. 1:13-CV-00931-SEB-TAB, 2014 WL 4636538, at *5 (S.D. Ind. Sept. 16, 2014) ("[T]he Appeals Council's decision to add the evidence to the exhibit list itself demonstrates that it considered the evidence to be new[,] material and time relevant. Any other decision would not be consistent with the record and common sense."). This, in turn, implies that the Council **did** proceed to the second step of its analysis. *See* HALLEX I-3-5-20(B). The Council's decision to deny review was thus an unreviewable step two decision, *see Perkins*, 107 F.3d at 1294, and the Court cannot reverse the SSA's decision on the basis of the Appeals Council's evaluation of Plaintiff's additional evidence. *Id. see also Pottorff*, 2014 WL 4636538, at *5 ("Accordingly, the Appeals Council's denial of review is not judicially reviewable.").

Plaintiff tries to escape this conclusion on the grounds it is not clear whether the Appeals Council actually **did** proceed to step two. [Dkt. 18 at 24-26.] Indeed, she claims that the Commissioner improperly concluded that the "evidence submitted to the Appeals Council was not new and material," [Dkt. 18 at 24], with the obvious implication that the Appeals Council actually denied Plaintiff's appeal at step one. If Plaintiff is correct—and the denial did occur at step one—then the Court can review the Appeals Council's decision; if Plaintiff is incorrect—

and the denial occurred at step two—then the Court cannot review the Appeals Council's
decision.

Plaintiff stakes her argument on *Farrell v. Astrue*, 692 F.3d 767 (7th Cir. 2012). There,
the Appeals Council issued a denial that stated that it had "'considered . . . the additional
evidence . . . [and] found that this information does not provide a basis for changing the
Administrative Law Judge's decision.'" *Id.* at 771 (alterations in original). The Seventh Circuit
noted that this language was ambiguous: the statement could mean that the Council "considered"
the evidence and found that it was not "qualifying" evidence, such that the denial occurred at
step one; or the statement could mean that the Council "considered" the evidence, found it was
qualifying, but still determined that a full review was unwarranted, such that the denial occurred
at step two. *See id.* ("On the one hand, it might indicate that the Appeals Council found the
proffered new evidence to be immaterial, but on the other hand it might indicate that the Council
accepted the evidence as material but found it insufficient to require a different result.").

The Seventh Circuit adopted the former reading. *Id.* It thus construed the Appeals
Council's order as a description of the first step in the Appeals Council process. This, in turn,
allowed the Seventh Circuit to review the Appeals Council's decision to determine if the Council
had made an error of law at step one. *Id.* ("We thus interpret the Appeals Council decision as
stating that it has rejected [Plaintiff's] new evidence as non-qualifying under the regulation and
proceed along the lines we indicated in *Perkins* to review that limited question.").

Plaintiff contends that the Court in this case should follow a similar approach. She asks
the Court to interpret the Appeals Council order as making a step one determination that the
evidence she submitted was non-qualifying. This, in turn, would allow the Court to conduct the

same sort of *de novo* review as was conducted in *Farrell*, with the possible result that the Court would reverse the Appeals Council's decision.

Plaintiff's case, however, is distinguishable from *Farrell*. In that case, the Appeals Council's order was ambiguous: the Seventh Circuit was not certain whether "the Appeals Council found the proffered new evidence to be immaterial" (a question of law that could be reviewed *de novo*), or whether "the Council accepted the evidence as material but found it insufficient to require a different result" (a discretionary decision that could not be reviewed). *See* 692 F.3d at 771.

Here, the Court faces no such ambiguity: the Appeals Council in this case designated the new evidence as an exhibit and added it to the record. [R. at 6.] As described above, this action confirms that the Appeals Council did in fact conclude that the newly submitted evidence was qualifying. *See* HALLEX I-3-5-20(B), 1993 WL 643143, at *1. As such, the Appeals Council **must** have proceeded to the second step of the analysis. *See* HALLEX I-3-5-20(B), 1993 WL 643143, at *1. The order in this case thus indicates that "the Council accepted the evidence as [qualifying] but found it insufficient to require a different result." *Farrell*, 692 F.3d at 771.[4] This conclusion is discretionary and cannot be reviewed, *see id.*, and the Court must therefore reject Plaintiff's invitation to remand this case on the basis of the Appeals Council's alleged error. Plaintiff, that is, may argue that the Council rejected her new evidence at step one, [*see* Dkt. 18

---

[4] In reply, Plaintiff argues that the Appeals Council order in *Farrell* also stated that the additional evidence had been designated as an exhibit, [*see* Dkt. 20 at 5 ("the Appeals Council exhibited such evidence on its order . . . in *Farrell*"], but nothing in *Farrell* actually indicates that this assertion is true: The only portion of the Appeals Council order reproduced in *Farrell* says nothing about whether the new evidence had been designated as an exhibit. *See* 692 F.3d at 771 (alterations in original) ("Here, the Appeals Council's decision says that it 'considered . . . the additional evidence . . . [and] found that this information does not provide a basis for changing the Administrative Law Judge's decision.'").

at 24], but that is not what happened: instead, the Council proceed to step two, and the Council then exercised its discretion to deny review. The Court must let that decision stand.

In reply, Plaintiff again draws on *Farrell*. [Dkt. 20 at 5.] She contends that refusing to permit judicial review of the Council's decision "would make the right recognized in the regulations to submit new evidence to the Appeals Council meaningless." [Dkt. 20 at 5 (quoting *Farrell*, 692 F.3d at 772).] This passage from *Farrell*, however, related to judicial review of the Appeals Council's decision at **step one** of its review. *See* 692 F.3d at 771-72 (emphasis added) ("The Commissioner contends that '[b]ecause the Appeals Council did not make any finding **with regard to the materiality of the evidence** Farrell submitted . . . there is nothing in the Appeals Council's denial of review upon which Farrell can properly pin an assertion of legal error.' This position . . . would make the right recognized in the regulations to submit new evidence to the Appeals Council meaningless."). This passage thus does nothing more than confirm the above-described principle that a court can review the Appeals Council's step one decision for any error of law. *See Perkins*, 107 F.3d at 1294. Here, however, no such error occurred: The Appeals Council in this case **did** determine that the evidence Plaintiff submitted was qualifying evidence, and the Council thus **did** review that evidence. The Council's decision after initiating that review—at step two—cannot be reviewed, and this Court cannot remand this case on the basis of that decision.

### 2. Sentence Six

Plaintiff argues that even if the Court does not determine that the Appeals Council erred, the Court should nonetheless remand this case pursuant to sentence six of 42 U.S.C. § 405(g). [Dkt. 18 at 27.] This sentence allows the Court to remand the case "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such

evidence into the record in a prior proceeding[.]"42 U.S.C. § 405(g). Evidence is "material" if there "is a reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered," and evidence is "new" if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Perkins*, 107 F.3d at 1296 (citations and internal quotations omitted).

Plaintiff contends that the evidence in Exhibit 18F is "new" because it was unavailable at the time of the ALJ's unfavorable determination. [Dkt. 18 at 28.] Plaintiff, however, submitted this evidence to the Appeals Council. [R. at 6.] The evidence therefore was in existence at the time of the "administrative proceeding," and the evidence accordingly is not "new" for the purposes of sentence six. *DeGrazio v. Colvin*, 558 F. App'x 649, 652 (7th Cir. 2014) ("The evidence . . . was not new for purposes of sentence six because it already had been presented to the Appeals Council."); *see also id.* (citing *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007)) ("[U]nder sentence six, a district court cannot remand for evaluation of evidence that was previously submitted to Appeals Council[.]");[5] *Pottorff*, 2014 WL 4636538, at *5 ("[E]vidence is no longer new for the purposes of sentence 6 remand if the Appeals Council has already considered it.").

---

[5] This conclusion could be viewed as creating a strange result: if Plaintiff had not submitted her additional evidence to the Appeals Council, then she might now be able to argue for remand under sentence six. It thus seems that asserting the right to submit evidence to the Appeals Council may have impaired Plaintiff's right to argue for remand before this Court. Under sentence six, however, the Court may not rule on the merits of a plaintiff's claim; instead, the court may only "order additional evidence to be taken before the Commissioner of Social Security[.]" 42 U.S.C.§ 405(g); *see also DeGrazio*, 558 F. App'x at 652 ("Sentence six authorizes a district court to remand without ruling on the merits[.]"). Thus, even if Plaintiff had skipped the submission of evidence to the Appeals Council, the best result Plaintiff could have achieved from a sentence six argument would be remand to the SSA to have her additional evidence considered by the agency. Plaintiff therefore would have been in the same position as when she **did** submit her additional evidence to the Appeals Council: i.e., having her additional evidence reviewed by the SSA. Thus, even if Plaintiff's sentence six argument must now fail, this failure has not impaired any right that Plaintiff had to have the evidence considered.

In reply, Plaintiff contests this conclusion on the grounds that it denies her the statutory protections that Congress intended to afford SSI and DIB applicants. [Dkt. 20 at 6.] She asserts that refusing to remand this case under either sentence four or sentence six reduces to a nullity her right to present new evidence. [*Id.*]

This assertion is incorrect: Plaintiff submitted her additional evidence to the Appeals Council; the Council determined that it was new and material; the Council considered it; and the Council concluded that the ALJ's decision was not contrary to the weight of the evidence. Plaintiff accordingly **was** afforded the right to have her evidence considered. Plaintiff may not care for the **result** that the Council reached, but the **procedures** that the Council followed did not deny Plaintiff any statutory protections to which she is entitled. To the extent that Plaintiff still views this result as harsh, any harshness in this case is mitigated by the fact that, as described above, remand is necessary for the ALJ to properly assess the opinion of Plaintiff's treating physician. Plaintiff may present her new evidence to the ALJ at that time, *see, e.g.*, *Johnson v. Astrue*, 683 F. Supp. 2d 833, 835 (N.D. Ind. 2010) ("Upon remand, Plaintiff may present new evidence to the ALJ and address the deficiencies Plaintiff finds with the first decision."), and so even if this Court cannot reverse the SSA's decision on the basis of this evidence, Plaintiff may still have the evidence considered once again.

## Conclusion

For the foregoing reasons, the Court finds that substantial evidence does not support the ALJ's decision that Jacquelyn Brown, is not entitled to Disability Insurance Benefits or Supplemental Security Income. The Magistrate Judge therefore recommends that the Commissioner's decision be **REVERSED** and **REMANDED**. On remand, the ALJ should reevaluate Dr. Means' opinion and reassess Plaintiff's treatment history. Any objections to the

Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date:  06/03/2015

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Joseph R. Wambach
KELLER & KELLER
joew@2keller.com

Thomas B. Browder
KELLER & KELLER
tomb@2keller.com

Timothy E. Burns
KELLER & KELLER
timb@2keller.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov